**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **JAMES HARDT AND MICHELLE HARDT, INDIVIDUALLY, AND AS NATURAL PARENTS AND NEXT FRIENDS OF L.H., A MINOR,** §<br>§<br>§<br>§ | **CASE NO._____** |
| **Plaintiffs,** § | |
| § | |
| **v.** § | |
| § | |
| **THE LAMPLIGHTER SCHOOL,** § | |
| § | |
| § | |
| **Defendant.** | |

**PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs James Hardt ("Mr. Hardt") and Michelle Hardt ("Mrs. Hardt") (together, "Mr. and Mrs. Hardt") file this original complaint individually, as natural parents, and next friends of their daughter, L.H. ("Child") against The Lamplighter School ("Lamplighter" or "Defendant") based on personal information as to their own actions and on information and belief as to all other matters, as follows:

**I.
PRELIMINARY STATEMENT**

1.      The Lamplighter School mission statement states that, "Dedicated to igniting the potential of each child, Lamplighter engages children in the joy of learning through intellectual discovery in a creative, inclusive, and collaborative environment."[1] Lamplighter also promises that its "core commitments" include academic excellence, joy of learning, and striving to be an inclusive community. The school promotes a "statement of inclusion" that states, "We value

---

[1] *See Mission*, https://www.thelamplighterschool.org/discover/mission (last accessed March 11, 2021).

1

individuality and encourage all children to reach their potential, while respecting their similarities and differences." With such high-minded ideals, one would expect Lamplighter to welcome the opportunity to assist a child with learning disabilities who is a member of its community. Yet ultimately, the school chose to tell a child with learning challenges to leave and seek enrollment elsewhere – after Lamplighter and its staff (including teachers and administrators) were unwilling to accept her differences and provide her with proper accommodations. For Mr. and Mrs. Hardt's daughter, the school that presented itself as valuing inclusiveness ultimately chose to exclude.

2.    With Lamplighter's educational mission and educational programs in mind, Mr. and Mrs. Hardt enrolled their daughter at the school. Lamplighter's educational program spans preschool ("Pre-K3" and "Pre-K4") through the fourth grade, with the option of a transitional year between kindergarten and the first grade. Lamplighter, an independent, co-educational school, represented itself as a "premier progressive school for young children" that understood the "complex growth and development of young children between the ages of three and six years."[2] Accordingly, Mr. and Mrs. Hardt enrolled their Child in Lamplighter for the 2017-18 school year with the expectation that Lamplighter would provide appropriate instruction to their daughter during her critical developmental years through the fourth grade.

3.    Unfortunately, during the three years that the Child attended Lamplighter, the school failed to adequately monitor or address her academic development. Subsequently, Lamplighter failed to provide appropriate and effective instruction that accommodated the Child's learning disabilities. Specifically, at the beginning of every school year, the Child's teachers were made aware of her diagnosed speech articulation and receptive expressive language disorder. At

---

[2] *See Early Childhood*, https://www.thelamplighterschool.org/learn/early-childhood (last accessed Feb. 28, 2021).

the beginning of the second year, the Child's strabismus condition was made aware to the Child's teacher. Further, the dyslexia diagnosis was known to the school in February 2020.

4.  Despite having knowledge of these conditions, Lamplighter made no modifications to the Child's instruction and effectively ignored the effects of the disabilities on the Child's reading abilities, performance assessments, and future learning. Instead, Lamplighter simply neglected its obligations to accommodate the Child's disabilities and directed the Child to leave and go to a different school. Based on inaccurate and illegitimate assessments of the Child, the Child was denied re-enrollment to Lamplighter for the 2020-21 school year and forced to search for a new school. Furthermore, the re-enrollment denial occurred *after* a documented, contractually agreed upon deadline for making such decisions – abandoning the Child and her family at a critical juncture in the Child's formative years.

5.  Lamplighter claimed to provide a curriculum "creative in experience, comprehensive in affect, and flexible in response to the unique needs of their students."[3] However, the school neither delivered on these claims nor did it provide the educational and administrative programs outlined in the contracted agreement with Mr. and Mrs. Hardt. For three years, Mr. and Mrs. Hardt entrusted the care of their Child to Lamplighter. They paid more than $50,000 in tuition for a promised premier-quality educational program. Appallingly, despite being aware of the Child's disabilities, Lamplighter disregarded its published policies prohibiting disability-based discrimination in school programs and activities. As a result, the Child lost critical learning time because Lamplighter failed in the school's obligation to recognize and acknowledge the developmental disabilities and reasonably accommodate the Child. Instead, Lamplighter simply

---

[3] *See Lower School*, https://www.thelamplighterschool.org/learn/lower-school (last accessed Feb. 28, 2021).

continued to move the Child along while disregarding their obligation to address the Child's unique learning needs, even as it continued to collect tens of thousands of dollars in annual tuition paid by Plaintiffs.

6.    Accordingly, Mr. and Mrs. Hardt bring this action and request judicial relief for, among other things, Defendant's violations of the Americans with Disabilities Act in their discrimination against the Child.

## II.
## PARTIES

7.    James Hardt is the Director of Engineering at Ridgemont Solutions, LLC and father of the Child. He is domiciled in Dallas County, Texas located in the city of Dallas.

8.    Michelle Hardt is wife of James Hardt and mother of the Child. She is domiciled in Dallas County, Texas located in the city of Dallas.

9.    The Lamplighter School is a private school located in the city of Dallas, Dallas County, Texas. It can be served at 11611 Inwood Road, Dallas, Texas 75229.

## III.
## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action: (1) pursuant to 28 U.S.C. § 1331, which grants United States district courts original jurisdiction over any civil action "arising under the . . . laws . . . of the United States[,]"; (2) because the matters at issue arise under the Americans with Disabilities Act ("ADA") of 1990, as amended by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. § 12101 *et seq.* and the federal regulations issued thereunder; and (3) pursuant to 28 U.S.C. § 1367, which grants the Court with supplemental jurisdiction over the state law claims, because the state law claims are sufficiently related to the other claims in the action subject to original jurisdiction that they form part of the same case or controversy under Article III of the Constitution.

11.    This Court has personal jurisdiction over Defendant because Defendant is domiciled in this District, and it is where the events giving rise to this complaint took place.

12.    Venue is proper in this Court pursuant to 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to Mr. and Mrs. Hardt's claims occurred in this District.

**IV.**
**FACTUAL BACKGROUND**

**A.    Lamplighter, A Self-Styled Premier Elementary School In Dallas, Texas, Claims To Be "Inclusive And Collaborative."**

13.    When deciding where to send their Child to school, Mr. and Mrs. Hardt chose Lamplighter because it claimed to be dedicated to "igniting the potential of each child" and engaging "children in the joy of learning through intellectual discovery in a creative, inclusive, and collaborative environment."[4] Nestled on a sprawling 12-acre campus in North Dallas, Lamplighter's roots run deep in the local educational community. Founded in 1953 in a farmhouse, the school moved to its current location on Inwood Road in 1969. In 2010, The Dallas Morning News reported that Lamplighter would purchase its 12.66-acre campus from The Hockaday School and that it was in the midst of fundraising $12.5 million for the land.[5] On its website, Lamplighter states that it acquired the land in 2012, and then led a $12.5 million "Campaign to Fund People, Place, and Programs" to enhance the campus with a new Barn and Innovation Lab.[6] In 2018, the Lamplighter campus was reimagined by Marlon Blackwell Architects. The expansion included a

---

[4] *See The Lamplighter School*, https://www.thelamplighterschool.org/ (last accessed Feb. 28, 2021).

[5] THE DALLAS MORNING NEWS, *After 40 Years, Lamplighter School Is Buying Its Site From Hockaday* (Sept. 9, 2010), https://www.dallasnews.com/business/2010/09/09/after-40-years-lamplighter-school-is-buying-its-site-from-hockaday/.

[6] *See Campus Life,* https://www.thelamplighterschool.org/page.cfm?p=1132 (last accessed March 11, 2021).

new Red Barn with a chicken coop, learning lab, and creative space.[7] The construction also added a 10,000-square-foot Innovation Lab "wrapped in copper and lined with wood planks" that holds classrooms, a woodshop, and robotics lab.[8]  Inside the classroom, Lamplighter boasts a Pre-K student-to-teacher ratio of 6 to 1, and a kindergarten to fourth grade student-to-teacher ratio of nine to one. The decision to send the Child to Lamplighter was not taken lightly, as the tuition for Lamplighter's Pre-K classes are approximately $14,000 per year and approximately $26,000 for kindergarten. Collectively, Mr. and Mrs. Hardt spent approximately $55,876 in tuition for the Child to attend Lamplighter.

14.     Only later would Mr. and Mrs. Hardt discover that Lamplighter's handling of the Child fell significantly below its required duty of care and promised standard of education. Worse, school staff maintained a stunning indifference to the best interests of the Child. In particular, Lamplighter refused to collaborate with Mr. and Mrs. Hardt and did not accommodate the Child with appropriate classroom instruction to meet her needs during her three years at Lamplighter.

**B.     The Child's First Year at Lamplighter: During The 2017-18 School Year, Lamplighter Gives No Indication Of Any Issues With The Child.**

15.     Upon enrolling their daughter at Lamplighter, Mr. and Mrs. Hardt signed a contract agreeing to the rules and regulations in the Lamplighter Family Handbook ("Lamplighter Handbook").[9]  The Lamplighter Handbook states that re-enrollment at Lamplighter is automatic, and if it is going to deny a student re-enrollment, the school must notify the student before February 1st of the current year.[10]  During the Child's first two-and-a-half years at Lamplighter, the school

---

[7] See *Lamplighter Barn*, https://www.marlonblackwell.com/project/lamplighter-barn/ (last accessed March 11, 2021).

[8] *Id.*

[9] Exhibit 1.

[10] *Id.* at 34.

did not give Mr. and Mrs. Hardt any indication that the Child would not be able to attend Lamplighter through the fourth grade.

16.     In October 2017, Katie Nelson ("Ms. Nelson"), the Child's Pre-K3 teacher, met with Mr. and Mrs. Hardt and told them that she was optimistic about the Child and her learning. Ms. Nelson commented that the Child was respectful of teachers, played well with the other children, completed her tasks, and took pride in what she accomplished. Additionally, Ms. Nelson commented that the Child would always get up and speak at show-and-tell.

17.     At the beginning of the 2017-18 year, Ms. Nelson was made aware by Mr. and Mrs. Hardt of the Child's speech articulation and receptive expressive language disorder. Nonetheless, throughout the course of the entire Pre-K3 year Ms. Nelson never mentioned the need for any supplemental speech instruction, nor was any additional instruction offered by Lamplighter. Additionally, the Child continued to receive satisfactory progress reports.

18.     In fact, at a parent-teacher conference in February 2018, Ms. Nelson continued to praise the Child.  She said that the Child was making great progress with her numbers and letters, was presenting confidently with a strong voice in front of the entire class, was speaking in complete sentences, and communicating well with friends. Additionally, although the Child struggled with the letter "y," she could write her name. Ms. Nelson commented that although the Child would occasionally get distracted and talk to other students, the Child was demonstrating overall academic progress.

19.     Given Ms. Nelson's reports at the end of the 2017-18 school year, Mr. and Mrs. Hardt had no reason to believe that the Child was not making notable progress in both her learning and development.

**C.      The Child's Second Year at Lamplighter: Mr. and Mrs. Hardt Inform Lamplighter About The Child's Strabismus Condition.**

20.      The beginning of the 2018-19 school year for the Child seemed promising. Lamplighter communicated to Mr. and Mrs. Hardt that their daughter was progressing from the previous school year and making significant progress in her learning and development.

21.      At the beginning of the 2018-19 year, the Child's Pre-K4 teacher, Laura Lavender ("Ms. Lavender"), was made aware by Mr. and Mrs. Hardt of the Child's speech articulation and receptive expressive language disorder. Nonetheless, throughout the course of the entire Pre-K4 year Ms. Lavender never mentioned the need for any supplemental speech instruction, nor was any additional instruction offered by the Lamplighter. Additionally, the Child continued to receive satisfactory progress reports.

22.      In September 2018, the Child complained to Ms. Lavender that "her eyes were moving around" during a class reading session. Ms. Lavender informed Mr. and Mrs. Hardt of the Child's complaints through email. Mr. Hardt responded to Ms. Lavender and explained that the Child had been diagnosed with strabismus, an eye misalignment condition that results in perception, strain, and general fatigue, among other issues. Further, Mr. Hardt stated that as a result of strabismus, the Child wears an eye patch every evening to help strengthen the muscles in her eye.

23.      Ms. Lavender did not respond to Mr. Hardt's email, nor did she review the issues again. Lamplighter did not propose or make modifications to accommodate the Child's vision disability and its effect on her reading ability, performance assessments, and future learning.

24.      Instead, in October 2018, Ms. Lavender reported that the Child paid attention well, finished her tasks, was happy when she was at school, and got along fine with the other children. Ms. Lavender also stated that as the Child continued to work on her numbers and letters, she knew

half of the alphabet, and the numbers one through 10.  According to Ms. Lavender, the Child continued to show improvement. There was no reason provided for Mr. and Mrs. Hardt to be concerned about the Child's development at Lamplighter.

25.     Similarly, in February 2019, Ms. Lavender reported additional progress made by the Child. Specifically, up from 13 letters, the Child could identify 25 (of 26) capital letters and 13 (of 26) lower case letters, could identify a triangle and a hexagon, and could recognize and identify her numbers through 20.

26.     Moreover, in May 2019, Ms. Lavender told Mr. and Mrs. Hardt that the Child had good handwriting, and that she could tell the Child read a lot. The teacher added that the Child's counting and lowercase letters still needed practice.  Ms. Lavender also said that the Child would, at times, spend too much time on work assignments so she began to use an egg-timer to remind the Child when to advance to the next assignment. Ms. Lavender stated that the Child had a successful year, and that all the children in her class, including the Child, were ready for kindergarten.

**D.     The Child's Third Year at Lamplighter: Mr. and Mrs. Hardt Notice A Lack Of Communication From Lamplighter And Indifference To Child's Academic Development.**

27.     Prior to the Child's kindergarten year, Lamplighter's feedback reinforced to Mr. and Mrs. Hardt that their Child was progressing academically at an appropriate pace. Mr. and Mrs. Hardt had no reason to believe that the Child was not receiving the appropriate instruction at Lamplighter. It would take until the Child's third year at Lamplighter, and tens of thousands of tuition dollars later, for Mr. and Mrs. Hardt to realize Lamplighter's indifference to the Child's academic development and its complete disregard to accommodate the Child's disabilities.

28.     The Child's third academic year at Lamplighter (Fall 2019 – Spring 2020) began under the care of Kaitlin Ebner ("Ms. Ebner"), a second-year kindergarten teacher. During a

parent-teacher conference in August of 2019, Ms. Ebner was made aware by Mr. and Mrs. Hardt of the Child's speech articulation and receptive expressive language disorder, and that the Child was taking speech therapy sessions. To further facilitate the Child's speech therapy, Mr. Hardt asked Ms. Ebner if the Child's speech therapist could work with the Child at school. Ms. Ebner confirmed that the Child's speech therapy sessions could take place at Lamplighter.

29.     Shortly after the parent-teacher conference, and based on Ms. Ebner's assurances, Mr. Hardt informed the Child's speech therapist that she could work with the Child at the school. The speech therapist then called Lamplighter to schedule a visit to the campus to provide speech therapy to the Child. However, the speech therapist was informed that she was not allowed on campus because Lamplighter had a contract with a different speech-therapy company. Although Mr. Hardt was bemused, as he was previously assured that it was possible for the speech therapist to visit the school, Mr. Hardt continued speech therapy sessions for the Child outside of school.

30.     This was the third straight year that Lamplighter was made aware of the Child's speech articulation and receptive expressive language disorder. Nonetheless, despite Lamplighter's awareness of the Child's speech therapy needs, Mr. and Mr. Hardt were never made aware of Lamplighter's in-house speech therapy services, nor was the Child offered access to such supposed services. Notably, Lamplighter's false assurances would continue.

31.     On September 23, 2019, Ms. June Landry ("Ms. Landry"), a reading specialist at Lamplighter, informed Mr. and Mrs. Hardt that she performed a reading-readiness screener on the Child.  Without providing more detail, Ms. Landry reported that the Child needed development with respect to letters and sounds as the Child prepared for reading. Nonetheless, as a result of the screening, Ms. Landry communicated that she would partner with Ms. Ebner for the remainder of

kindergarten to assist with the Child's development. Mr. Hardt had every confidence that the partnership between Ms. Landry and Ms. Ebner would yield positive results.

32.     Ultimately, neither Ms. Landry nor Ms. Ebner worked with the Child on her development of letters and sounds.  This was kept from Mr. and Mrs. Hardt, as they would only learn four months later that neither Ms. Landry nor Ms. Ebner worked with the Child. In fact, later in the year, the Child communicated to Mr. and Mrs. Hardt that when she would raise her hand for assistance, Ms. Ebner avoided her. Mr. and Mrs. Hardt had to resort to telling the Child to request assistance from Ms. Ebner's teaching assistant. Lamplighter knew of the Child's struggles and again failed to make modifications to accommodate the Child's disabilities.

33.     During a parent-teacher conference in October 2019, Ms. Ebner reported that the Child could count to 30, count to 100 by tens, had positive interactions with peers, was very cooperative, and enjoyed school. Ms. Ebner reported that the Child was still developing in letters and sounds, and was not yet writing words. However, Ms. Ebner failed to disclose that she did not assist the Child with addressing these issues and attempted to characterize the Child's learning differences as behavioral issues. For example, Ms. Ebner stated that the Child did not follow directions and asked for a lot of assistance.  Ms. Ebner remarked that the Child had difficulty completing some of her work on time, and that the incomplete work was going into an incomplete folder. Ms. Ebner stated that the Child needed to work on the deficient work.

34.     As time went on, Ms. Ebner failed to work with the Child on her incomplete work. As a result, the work continued to accumulate with no apparent solution. Mr. Hardt asked that the folder of incomplete work be sent home with the Child so that all assignments could be completed. Without any reason or explanation, Ms. Ebner dismissively replied, "No."

35.     On November 1, 2019, in an attempt to further characterize the Child as exhibiting behavioral issues, Ms. Ebner sent an email to Mr. and Mrs. Hardt to notify them that the Child threw another student's backpack down the hallway. Ms. Ebner stated that this was the fourth incident with the Child, although Mr. and Mrs. Hardt were not made aware of **any** previous incident. Mr. and Mrs. Hardt never received an email, phone call, nor were told at the parent teacher conference that occurred just **one week before** about any prior behavioral issues. Mr. Hardt followed up with Ms. Ebner about the alleged incidents with three separate emails, but Ms. Ebner never replied.

36.     Rather, in contravention to Lamplighter policies, Ms. Ebner disciplined the Child by singling her out in front of the other students for innocuous behavior and did not allow the Child to participate in class events. This created a hostile learning environment that exacerbated problems and made it difficult for the Child to receive the assistance she needed to effectively address her learning disabilities. While Ms. Ebner would, in effect, be demoted the following year, the damage had already been done – the Child did not receive the appropriate care or instruction to remediate her learning disabilities.

**E.     Mr. and Mrs. Hardt Begin To Plan For The Child's Migration Into Lamplighter's Transitional First-Grade Program.**

37.     Notwithstanding Ms. Ebner's shortcomings, Mr. and Mrs. Hardt looked forward to enrolling the Child in Lamplighter's transitional first-grade program.

38.     At Lamplighter, all kindergarten students have the option to choose between two different programs for the upcoming school year: either (i) a traditional first grade or (ii) a *transitional* first grade (the "T1 Program"). The T1 Program is described as a more gradual transition from the kindergarten program, as it has its own curriculum and challenges, building on the content and skills learned in kindergarten. The T1 Program is an additional year between

kindergarten and the traditional first grade. The T1 Program is seen as a time that children can grow, become more self-aware, more self-disciplined, and more confident before entering the traditional first grade. Lamplighter, in fact, calls the T1 Program, "The Gift of Time."

39.     Hoping to give their daughter this gift of time, Mr. and Mrs. Hardt decided that the T1 Program would be the best option for the Child. Mr. and Mrs. Hardt believed that the T1 Program would build the Child's confidence in her skills and learning, and that she would also receive additional instruction prior to entering the traditional first grade.

40.     Accordingly, in or around December 2019, Mr. Hardt informed Ms. Ebner and Judith Mullens ("Ms. Mullens"), Lamplighter's Assistant Head of Teaching and Learning Early Childhood, that they elected the Child attend the T1 Program in the upcoming school year. Mr. and Mrs. Hardt had no reason to believe the Child would not return to Lamplighter the following year.

**F.     Lamplighter Raises Purported Developmental Issues As A Pretext to Eventually Refuse the Child Re-Enrollment.**

41.     On January 15, 2020, Mr. and Mrs. Hardt met with Ms. Ebner, Ms. Mullens, and Jill Schroeter ("Ms. Schroeter"), Lamplighter's in-house counselor, to finalize the program that the Child would attend for the upcoming school year at Lamplighter.  Instead of a group discussion regarding the Child's future at Lamplighter, however, Ms. Ebner, Ms. Mullens, and Ms. Schroeter bombarded Mr. and Mrs. Hardt with harsh, scripted criticism of the Child's academic progress in an effort to ultimately deny re-enrollment to the Child. As Mr. and Mrs. Hardt would come to learn, these were pretexts upon which Lamplighter would refuse re-enrollment to the Child.

42.     Ms. Ebner began the meeting by attempting to characterize the Child as having behavioral issues. Ms. Ebner stated that the Child tended to have younger friends in her kindergarten class and that the Child preferred "dramatic and imaginative plays" with her friends,

instead of working on puzzles. Two days after this meeting, however, the Child celebrated her sixth birthday with a party of more than 17 of her friends, of various ages. Additionally, Ms. Ebner said that the Child would take twice as long to finish a five-minute assignment and would require breaks during those assignments. Ms. Ebner's accounts of these purported problems had never been discussed with Mr. and Mrs. Hardt during the parent teacher conference or any other communication prior to this meeting. At no time during the meeting did Ms. Ebner acknowledge the Child's disabilities or consider the effects that they had on the Child's learning.

43.    Next, Ms. Schroeter informed Mr. and Mrs. Hardt that she administered the Gesell test, intended to determine a child's collective behavior and performance on a developmental scale, in December 13, 2019. Mr. and Mrs. Hardt were not notified beforehand that the Gesell test would be administered to the Child. Nor did Ms. Schroeter deliver the results in an appropriate or timely manner. Ms. Schroeter waited more than a month to deliver the results.

44.    The results from Ms. Schroeter's Assessment indicated that the Child was ten months behind developmentally. However, Ms. Schroeter's scoring effort conflicted with other assessments. For example, a year earlier, the Child was administered the Gesell test by The Hockaday School ("Hockaday"), another independent school in Dallas. The result of Hockaday's test revealed that the Child tested at her age level for all indicators other than verbal fluency and clarity of speech, and in fact indicated that the Child was developmentally one month above her actual age level. Additionally, on December 3, 2019, the Child was administered the Wechsler Intelligence Scale for Children by a collaborative academic testing service in which the Child scored "average" or "high average" for all tested categories. Due to anomalous reported results from Ms. Schroeter's scoring effort, Mr. and Mrs. Hardt requested a copy of the scoring evaluation. When they received Ms. Schroeter's evaluation, it was a sparse assessment report filed with

14

subjective comments of the Child's performance. Notably, while Ms. Schroeter was directly made aware of the child speech articulation and expressive receptive language disorder, the Gesell test was neither administered with appropriate accommodations, nor scored with considerations to the Child's learning disabilities.

45.     In discussing the results, Ms. Schroeter stated that the Child scored a 5.1. Ms. Schroeter added that a score of 5.1 meant that the Child was at the developmental level of a child of the age of five years and one month. The Child's age, at the time that Ms. Schroeter administered the test, was 5 years and 11 months.  Ms. Mullens stated that a developmental level six months behind a child's age was a good indication that a child was suitable for the T1 Program. Ms. Mullens stated that, given the Child's age and the score the Child received by Ms. Schroeter's test, the Child's developmental level was a "red flag" for her enrollment in the T1 Program.

46.     As a result of Ms. Schroeter's findings, Ms. Mullens then recommended to Mr. and Mrs. Hardt that they have an external evaluation performed on the Child's learning style. Ms. Mullens commented that based on the results from the external learning review, they would determine whether the Child was a good candidate for the T1 program. Ms. Mullens said that if there was a learning disability, that Lamplighter would support the Child along the way.

47.     Believing that the external evaluation would foster support from Lamplighter for the Child, and would be relied on to enroll the Child in the T1 Program, Mr. and Mrs. Hardt agreed.

**G.     Dyslexia Diagnosis: At Lamplighter's Request, Mr. And Mrs. Hardt Have The Child Evaluated By An Outside Diagnostician and She is Diagnosed with Dyslexia.**

48.     Fifteen days after the January 2020 meeting, Mr. and Mrs. Hardt had the Child evaluated by Laurie Gaines-Peterson ("Ms. Gaines-Peterson"), a diagnostic specialist at Diagnostic Learning Services. On January 30, 2020, Ms. Gaines-Peterson put the Child through extensive testing and multiple assessments to determine the Child's intellectual functioning,

including the Child's learning style, through formal measures. Ms. Gaines-Peterson tested the Child for more than four hours. After performing several tests and assessments, Ms. Gaines-Peterson's diagnostic impression of the Child was: DSM-V-315.00 – Specific Learning Disorder, Reading, Dyslexia. DSM-V-315.00 is alternatively known as dyslexia and involves impairment in reading and includes possible deficits in word reading accuracy, reading rate or fluency, or reading comprehension.

49.     On February 5, 2020, Ms. Gaines-Peterson met with Mr. and Mrs. Hardt to discuss the test results. Based on her assessment, Ms. Gaines-Peterson stated that the Child would benefit from a transitional year between kindergarten and the first grade – making her a seemingly ideal candidate for Lamplighter's T1 Program.

50.     Ms. Gaines-Peterson informed Mr. and Mrs. Hardt that despite the associated difficulties, if accommodated, dyslexia can be remediated. As such, Ms. Gaines-Peterson recommended that the Child enroll in the Scottish Rite Take-Flight Reading Program which is based on the Orton-Gillingham based curriculum for dyslexia intervention. The Orton-Gillingham based curriculum also happens to be the program that the Lamplighter reading specialist uses for in-house remediation therapy with Lamplighter students.

51.     Ms. Gaines-Peterson emphatically stated that the Child would be wildly successful right where she was at Lamplighter, if she got the help she needed. Moreover, Mr. and Mrs. Hardt were aware of other children with a dyslexia diagnosis who were offered and received Lamplighter accommodations and progressed academically.

**H.     Lamplighter Disregards the Dyslexia Diagnosis: Rather Than Accommodating The Child, The Child Is Told To Go To A Different School.**

52.     On February 21, 2020, the second T1 meeting was held to discuss the Child's placement determination based on the results from Ms. Gaines-Peterson's evaluation. In addition

to Mr. and Mrs. Hardt, in attendance were Ms. Mullens, Ms. Schroeter, Ms. Ebner, and Dr. Joan Hill ("Dr. Hill"), Lamplighter's Head of School. Based on prior communications by Ms. Mullens, her team, and on Ms. Gaines-Peterson's recommendation that the Child would benefit from the transitional grade, Mr. and Mrs. Hardt believed that Lamplighter would agree that the Child would be enrolled in the T1 Program.

53.     However, as before, Ms. Ebner began the meeting and provided previously undisclosed claims of purported behavioral issues that attempted to portray the Child in a negative light. In particular, Ms. Ebner stated that the Child was now a distraction to other students in class.

54.     Next, Ms. Schroeter informed Mr. and Mrs. Hardt that she instructed Ms. Landry, the school's in-house language specialist, to remove the Child from class and evaluate the Child, even though Lamplighter had already received the written report by Ms. Gaines-Peterson with the official dyslexia diagnosis. After the external diagnostic exam report was submitted to Lamplighter on February 19, 2020, Ms. Landry's test results evaluated the Child to purportedly now have a "fragile" reading profile. However, the results from this exam were not used to determine what accommodations the Child would receive. Instead, the reading deficiencies that Ms. Landry identified were used in constructed arguments by Ms. Schroeter and the rest of the administrators as to why the Child should no longer be allowed to attend Lamplighter.

55.     As such, Dr. Hill stated that she, along with Ms. Ebner, Ms. Schroeter, and Ms. Mullens, believed that the Child should go to a different school. In referencing Ms. Gaines-Peterson's diagnostic report, Dr. Hill attempted to characterize the Child's learning differences as attributable to either an attention deficit disorder or attention-deficit/hyperactivity disorder ("ADD/ADHD"). Dr. Hill commented that, "It seemed that attention is an issue, but we can't make

17

that diagnosis." Ms. Gaines-Peterson's report never mentioned ADD/ADHD as being a concern, and in fact, found, "The Child respects authority and does not show behavior that is of concern."

56. Toward the end of the meeting, out of frustration and an unwillingness to accommodate the Child, Ms. Mullens exclaimed that even if "Ms. Landry would work with the child once a week . . . who would help the child the other four days?!" Although Lamplighter had programs and staff in place to accommodate the Child, Mr. and Mrs. Hardt repeatedly communicated that they would offer to pay for any expenses associated with any outside assistance for the Child. Nevertheless, Ms. Landry would never work with the Child, nor were Mr. and Mrs. Hardt allowed to pay for and provide on-site therapy to assist the Child.

57. As prior meetings had shown, it was clear Lamplighter was unwilling to accommodate the Child. It also became clear that Ms. Ebner, Ms. Schroeter and Dr. Hill completely disregarded the Child's professionally diagnosed learning disabilities.

58. While Lamplighter proclaimed to offer a collaborative and inclusive learning environment, the school made no effort to work with the Child to address her disabilities and specific needs. Rather, Lamplighter ignored its obligation to accommodate the Child and told her to "go to a different school."

## I. After Lamplighter Disregarded The Dyslexia Diagnosis, Mr. And Mrs. Hardt Seek Advice From Members Of The International Dyslexia Association.

59. Disappointed with Lamplighter's response during the second T1 meeting, Mr. and Mrs. Hardt sought the expert advice of educational consultant Dr. Eleanor Munson ("Dr. Munson"). Dr. Munson is a member of the International Dyslexia Association, the Davidson Institute Educators Guild, and is a Certified Education Planner specializing in private school placement (Pre-K through 12th grade).

60.     On March 3, 2020, Dr. Munson reviewed Ms. Gaines-Peterson's report and said that Ms. Gaines-Peterson did an excellent job. Dr. Munson confirmed that dyslexia can be remediated, and also specifically recommended that the Child take part in the Scottish Rite Take-Flight Reading Program – the same program employed by Lamplighter to assist students such as the Child. Dr. Munson specifically stated that programs like the T1 Program are meant for students such as the Child.

61.     Dr. Munson recommended the Child continue at Lamplighter and suggested that Mr. and Mrs. Hardt could offer to pay for the on-site therapy for the Child four to five times per week to address the Child's dyslexia.  Dr. Munson further recommended that all parties could revisit the Child's progress at the midterm of the 2020-21 school year, if necessary.

**J.     Assurances of Enrollment in the T1 Program: Dr. Hill Assures Mr. And Mrs. Hardt That The Child Can Enroll for the 2020-21 School Year.**

62.     Encouraged by the meeting with Dr. Munson, Mr. and Mrs. Hardt understood the T1 Program to be the best option for the Child. Mr. and Mrs. Hardt decided to meet with Dr. Hill to discuss their findings. Mr. and Mrs. Hardt believed that the recommendation of *two* outside and independent evaluators that the Child attend the T1 Program would be more than sufficient to demonstrate the Child would succeed in the T1 program.

63.     In a meeting on March 6, 2020, Mr. Hardt reiterated to Dr. Hill how Ms. Gaines-Peterson tested the Child for several hours and explained how she arrived at the diagnosis and the best approach to completely remediate the disability. Additionally, Mr. Hardt detailed plans to immediately start the therapy five days a week that had been recommended by Ms. Gaines-Peterson and Dr. Munson.

64.     Mr. Hardt also told Dr. Hill that Ms. Gaines-Peterson stated that the Child was a "sharp kid."  Dr. Hill responded in agreement and even mentioned how well the Child had

performed at her music recital in the fall.  Dr. Hill went on to mention her many pleasant social interactions with the Child.

65.     During the meeting, Dr. Hill stated, "You have a Lamplighter contract for next year, so don't you worry about that."  Accordingly, Mr. Hardt proposed they revisit the Child's progress at the midterm of the T1 program. After this meeting, Mr. and Mrs. Hardt had every confidence that the Child would attend Lamplighter for the 2020-21 school year.

**K.      Reversal of Assurances: Despite Promising The Child The Opportunity To Continue At Lamplighter, Lamplighter Denies The Child Re-Enrollment for the 2020-21 Year.**

66.     Less than a week after meeting with Mr. and Mrs. Hardt, Dr. Hill reconvened her team and Mr. and Mrs. Hardt for a final meeting on the Child's enrollment in the T1 Program.  In attendance were Dr. Hill, Ms. Ebner, Ms. Schroeter, Ms. Mullens, and Mr. and Mrs. Hardt.

67.     During the meeting on March 10, 2020, Dr. Hill commented that she received a progress report on the Child's academic development progress that was prepared by Ms. Schroeter that discussed the Child's schoolwork under Ms. Ebner's instruction. Dr. Hill decided, based on the information in the report, that the Child was too far behind academically and should, therefore, not attend Lamplighter for the 2020-21 school year.

68.     After hearing Dr. Hill's statement, Mr. Hardt immediately replied, "Dr. Hill, you said last Friday that we had a contract for next year."  Mr. Hardt went on to ask her if she was saying something different now – to which Dr. Hill responded, "Yes." Dr. Hill went on to say that with the new school year more than six months away there "would not be enough time for the Child to catch up before the new school year."

69.     Mr. Hardt remarked that Dr. Hill's communications were antithetical to Lamplighter's previous representations that the Child's academic abilities were progressing. Instead, as a last-minute means to justify denying the Child re-enrollment, Dr. Hill relied on

20

inaccurate and illegitimate evaluations that did not consider the Child's learning disabilities. In fact, none of the assessments made by Lamplighter provided any accommodations that a school is obliged to provide when evaluating disabled students.

70.     Lamplighter repeatedly failed to consider the effects of the Child's learning disabilities and offered no solutions or accommodations to Mr. and Mrs. Hardt to address these learning challenges. They disregarded the Child's strabismus and failed to accommodate her in any way. Once the Child was diagnosed with dyslexia, Lamplighter decided it would not help the Child, even though they had programs in place designed for such purposes.

**L.     The Damage Done: Lamplighter Robbed The Child Of Three Of Her Most Formative Years, And Left Her Without A School To Attend.**

71.     For three years, Mr. and Mrs. Hardt trusted Lamplighter with their Child's most critical years of development. Per the terms of the agreement detailed by the Lamplighter Handbook, they trusted that the school would work with families such as their own to support students with academic needs. They relied upon a belief their Child would have a school to attend through the fourth grade.

72.     After three years at the school, Mr. and Mrs. Hardt discovered that Lamplighter lied to them. For the time that the Child attended Lamplighter, the teachers and administrators disregarded all the signs of the Child's learning disabilities and allowed her to struggle alone through the most crucial years of her early childhood, all the while representing to Mr. and Mrs. Hardt that the Child was academically progressing.

73.     Lamplighter boasts of teachers who "understand that students learn in many different ways, and through that understanding [are] creative, imaginative and experimental in helping each student reach their maximum potential in a way that suits them best." In reality,

school officials, including Dr. Hill, Ms. Ebner, and Ms. Schroeter, made no effort to work with the Child to accommodate her specific learning needs, and simply left the child behind.

**V.**
**CLAIMS**

**Count One: Violation of Title III of the Americans with Disabilities Act**

74.     The allegations set forth in the paragraphs above are hereby incorporated as if fully set forth herein.

75.     An actionable and justiciable controversy exists between Plaintiffs and Defendants under Title III of the Americans with Disabilities Act ("ADA") of 1990, as amended by the ADA Amendments Act of 2008, 42 U.S.C. § 12101 *et seq.*

76.     To state a prima facie claim under Title III of the ADA, Plaintiffs must prove (1) that the Child is "disabled," as defined by the ADA; (2) that the Defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) that the Defendant discriminated against the Child because of the Child's disability.

77.     The Child has disabilities as the term is defined in 42 U.S.C. § 12102. Namely, as set forth above, the Child is diagnosed with the disabilities of speech articulation and receptive expressive language disorder and dyslexia. Lamplighter is a private entity that operates a public place of accommodation as defined in 42 U.S.C. § 12181.  As a result of the Child's disabilities, the Child qualified for reasonable accommodations by Lamplighter.

78.     Lamplighter discriminated against the Child because of her disabilities in the following ways: (1) Lamplighter failed to reasonably accommodate the Child and denied her enrollment in Lamplighter's educational programs and activities, (2) Lamplighter failed to reasonably accommodate the Child and denied the Child the ability to participate in on-site therapy to remediate her disabilities, (3) Lamplighter failed to allow Mr. and Mrs. Hardt to pay and provide

22

on-site therapy at Lamplighter to remediate her disabilities, (4) Lamplighter failed to arrange for appropriate testing and evaluations that could identify conditions or differences that required special accommodations by Lamplighter, and (5) Lamplighter failed to test or evaluate the Child with tests or evaluations that appropriately considered the Child's learning disabilities.

79.     Lamplighter had an affirmative legal duty to make necessary and reasonable modifications to programs to accommodate the needs of the Child, a student with learning disabilities. Lamplighter never reasonably accommodated the Child as required under Title III of the ADA and neglected to facilitate the Child's participation. Namely, after the Child was professionally diagnosed with dyslexia, the Child was denied enrollment in Lamplighter's T1 program, a transitional program that education professionals considered the Child to be an ideal candidate for enrollment.

80.     Further, after learning that the Child was diagnosed with dyslexia, Mr. Hardt requested that Lamplighter reasonably accommodate the Child with on-site therapy sessions. Mr. Hardt arranged for a therapist to come to the school five times a week to help the Child, for which Mr. and Mrs. Hardt would bear all costs. Lamplighter failed to reasonably accommodate the Child in its own academic programs. Lamplighter also failed to reasonably accommodate the Child when it disregarded Mr. and Mrs. Hardt's requests for on-site therapy for the Child's speech articulation and receptive expressive language disorders.

81.     Moreover, Lamplighter denied the Child's enrollment in the T1 program on the basis of inaccurate testing and evaluations. Prior to the Child's official dyslexia diagnosis, Lamplighter conducted a reading test and a Gesell test. Although the report was used as a pretext to not re-enroll the Child, Lamplighter evaluations did not take into account the Child's disabilities.

Therefore, the decision for enrollment in the T1 program was flawed and failed to consider the disability diagnoses.

82.     Lamplighter clearly communicated that it was not willing to handle or address the concerns of a child with learning disabilities. The policies and practices of Lamplighter, its teachers and administrators discriminated against the Child on the basis of the Child's disabilities are violations of Title III of the ADA. These violations have caused and will continue to cause damage to Plaintiffs in an amount to be determined at trial, plus attorneys' fees and costs.

## Count Two: Negligence

83.     The allegations set forth in the paragraphs above are hereby incorporated as if fully set forth herein.

84.     An actionable and justiciable controversy exists between Plaintiffs and Defendants.

85.     As those entrusted with the care of the Child, Lamplighter, Dr. Hill, Ms. Mullens, Ms. Schroeter, and Ms. Ebner had duties to address and accommodate the Child's learning disabilities. Lamplighter breached their duties in the following: (1) Lamplighter remitted progress reports of the Child that were inaccurate, (2) Lamplighter failed to arrange for appropriate testing and evaluations that could identify conditions or differences that required special accommodations, (3) Lamplighter failed to accommodate and denied the Child's enrollment participation in Lamplighter's educational programs and activities including Lamplighter's speech therapy, (4) Lamplighter failed to accommodate and denied the Child's enrollment or participation in Lamplighter's educational programs and activities, including working with Lamplighter's reading specialist, (5) Lamplighter failed to accommodate and denied the Child the ability of on-site therapy sessions to remediate her dyslexia disability, (6) Lamplighter failed to allow Mr. and Mrs. Hardt to pay and provide on-site therapy at Lamplighter to remediate her disabilities, and (7)

Lamplighter failed to test or evaluate the Child with tests or evaluations that appropriately considered the Child's diagnoses.

86.     During the Child's first two-and-a-half years at Lamplighter, Mr. and Mrs. Hardt received reports that the Child was progressing academically.  Lamplighter's reports gave Mr. and Mrs. Hardt no reason to question Lamplighter's educational or overall instruction. It was not until Mr. and Mrs. Hardt met with Ms. Ebner, Ms. Mullens, and Ms. Schroeter to discuss the Child candidacy for the T1 program that they were made aware of the Child's probable learning disabilities.

87.     At this meeting, Ms. Schroeter informed Mr. and Mrs. Hardt that according to the Gesell test she administered, the results showed the Child was nearly 12 months behind developmentally. Ms. Schroeter remitted a sparse assessment report of the Child's performance that did not state whether, as required by the ADA, the test was administered with consideration of the Child's disabilities. Mr. and Mrs. Hardt then took the Child to an outside specialist who diagnosed her with dyslexia. After Mr. And Mrs. Hardt shared the Child's diagnosis with Lamplighter, Lamplighter continued to disregard her disabilities and made no effort to accommodate the Child. Instead, Lamplighter failed to act until the Child was purportedly so far behind that Lamplighter used her performance as a pretext to deny re-enrollment for the Child.

88.     At the beginning of every school year, Lamplighter was made aware by Mr. and Mrs. Hardt of the Child's speech articulation and receptive expressive language disorder. Nonetheless, throughout the course of the Child's time at Lamplighter, it never mentioned the need for any supplemental instruction, nor was any additional instruction offered by the Lamplighter. Additionally, the Child continued to receive satisfactory progress reports. Despite their awareness,

Lamplighter continued to withhold any accommodations or specialized education opportunities from the Child.

89.     Just weeks after the Child was diagnosed with dyslexia, Lamplighter decided it would simply not accommodate the Child, and forced her to find another school to attend for the upcoming school year. The Child was effectively abandoned by the faculty and administration of The Lamplighter School. As a result of Lamplighter's direct and proximate neglect, the Child has been harmed and damaged such that the Child's developmental progress has been delayed. The Child was denied access to a transitional education program not available to the Child elsewhere.

90.     Plaintiffs have been and continue to be harmed by Defendant's failure to adequately address and accommodate the Child's learning disabilities.  Defendant's negligence has caused and will continue to cause damage to Plaintiffs in an amount to be determined at trial, plus attorneys' fees and costs.

## Count Three: Breach of Contract

91.     The allegations set forth in the paragraphs above are hereby incorporated as if fully set forth herein.

92.     An actual and justiciable controversy exists between Plaintiffs and Defendants.

93.     An agreement existed between Plaintiffs and Defendants for continued enrollment at Lamplighter.  Specifically, upon enrolling their children into Lamplighter, parents sign an enrollment contract with Lamplighter. In the enrollment contract, parents are referred to and agree to the rules and regulations specified and included in the Lamplighter Handbook.

94.     The Lamplighter Handbook lists the procedures and rules by which Lamplighter is governed. The Lamplighter Handbook states that re-enrollment at Lamplighter is automatic.  If

Lamplighter decides to deny a student re-enrollment, the school must inform the student and parents before February 1st of the enrollment year. Contrary to the requirements of the Lamplighter Handbook, Mr. and Mrs. Hardt were informed nearly a month after this deadline, breaching the contract. Specifically, Mr. and Mrs. Hardt were informed on March 10, 2020, more than a month after the required time.

95.     Additionally, Dr. Hill breached Lamplighter's agreement with Mr. and Mrs. Hardt pursuant to Lamplighter's governing Family Handbook. Based on Dr. Hill's representations, Mr. and Mrs. Hardt not only correctly understood that the Child was automatically re-enrolled, Dr. Hill reassured them of their contract for the upcoming year just days before ultimately breaching the agreement. However, less than a week after Dr. Hill assured Mr. and Mrs. Hardt that their Child had an enrollment contract for the next year, she breached Lamplighter's written contract with Mr. and Mrs. Hardt. Dr. Hill informed them the Child would not be able to enroll for the next school year on March 10, 2020 – more than a month after the February 1st deadline.

96.     Plaintiffs have been and continue to be harmed by Defendant's breach of contract. Defendant's breach of contract has caused and will continue to cause damage to Plaintiffs in an amount to be determined at trial, plus attorneys' fees and costs.

## VI.
## DEMAND FOR JURY TRIAL

97.     Plaintiffs hereby demand a trial by jury on all issues of fact to which he is entitled to a jury trial in this action.

## VII.
## PRAYER

For all the foregoing reasons, Mr. and Mrs. Hardt request that the Court enter judgment in their favor and award them the following relief against Lamplighter:

a. Injunctive relief requesting Defendant, and each of its agents, servants and employees, and those persons in active concert or participation with the Defendant, modify its evaluation process when it evaluates children with learning differences, which can prevent future harm as well as imminent harm to the children who are currently enrolled at Lamplighter who have learning differences, including but not limited to speech articulation and receptive expressive language disorder and dyslexia;

b. A court monitor of Lamplighter's evaluation activities quarterly for the next five years to prevent the improper evaluation of children during their formative years;

c. Actual damages and consequential damages for injuries sustained as a result of Defendants' breach of contract;

d. Actual damages as a result of Defendants' negligence;

e. Punitive or exemplary damages in an amount to be determined at trial;

f. Costs of court; and

g. Reasonable and necessary attorneys' fees.

Dated: April 5, 2021                    Respectfully submitted,

                                        **BREWER STOREFRONT, PLLC**

                                        By: ___*/s/ William A. Brewer III*___
                                        William A. Brewer III
                                        State Bar No. 2967035
                                        wab@brewerattorneys.com
                                        Efraín Vera
                                        State Bar No. 24122707
                                        exv@brewerattorneys.com
                                        1717 Main Street, Suite 5900
                                        Dallas, Texas 75201
                                        Telephone: (214) 653-4000
                                        Facsimile:  (214) 653-1015

                                        **COUNSEL FOR PLAINTIFFS**